**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

TAMMY MARSH, Administratrix of the
Estate of MAHLON CHRISTOPHER
MOSHER,

        Plaintiff,

            v.

NORFOLK SOUTHERN, INC.,
CANADIAN PACIFIC RAILWAY, and
JEFFREY D. BOYD,

        Defendants.

CIVIL ACTION NO. 3:14-CV-02331

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is a Motion for Summary Judgment (Doc. 47) filed by Defendants Norfolk Southern Railway Company, Canadian Pacific Railway, and Jeffrey D. Boyd (collectively "Defendants"). This case concerns a fatal accident involving a train owned by Defendant Norfolk Southern Railway Company ("NSRC"), and operated by locomotive engineer Defendant Jeffrey D. Boyd ("Boyd"), which struck and killed Mahlon Mosher ("Mosher"), a 16 year-old high school student who was walking alongside railroad tracks, owned by Defendant Canadian Pacific Railway ("CPR"), on December 11, 2012. Because Plaintiff Tammy Marsh ("Plaintiff"), the administratrix of the estate of Mosher, has not established that a genuine issue of material fact exists to support the claim that Defendants acted wantonly, Defendants' motion for summary judgment will be granted.

## I. Factual Background[1]

---

[1] The following summary of facts is based on the Concise Statement of Material Facts as set forth by Defendants (Doc. 48), and incorporated by Plaintiff. (Doc. 55, at 7). Plaintiff does take issue, however, with several statements referenced in the Concise Statement of Material Facts that may indicate that Mosher committed or intended to commit suicide on the date of the incident. Because those averments, even if true, did not factor into the disposition of this motion, they are not incorporated into the following factual summary.

This action arises out of an accident that occurred on the morning of December 11, 2012, between a northbound NSRC train operated by locomotive engineer Boyd and Mosher, who was walking to school along the single line railroad track owned by CPR, at approximately mile post 632.8 in New Milford, Pennsylvania.[2] The train's other crew members were conductor Christopher Chesmore ("Chesmore") and conductor trainee Aaron Willis ("Willis"). The train consisted of three (3) locomotives (NS 6713, NS 9138, and NS 9642), sixteen (16) loaded cars, and twelve (12) empty cars; it was 1,608 feet long and weighed 2,571 tons.

The train left Allentown, Pennsylvania on December 10, 2012, and was destined for Binghamton, New York. As the train traveled north toward Binghamton on the morning of December 11, 2012, the speed limit in the area of the accident was forty (40) miles per hour. As the train came around a set of curves and into a straightaway, the crew observed something ahead along or near the tracks. Boyd described the "something" as a "black blob I guess basically, just something black by the tracks," and did not realize at that time that it was a person. Chesmore described seeing "something that's basically like a shadow on the tracks up ahead," and, along with Willis, also did not initially realize that it was a pedestrian.

Willis testified that he said, "What's that?" as the train was in the straightaway, and a few seconds elapsed when he said, "it looks like someone walking along the tracks." Boyd and Chesmore acknowledged there was "something" up ahead and, at that time, Boyd began blowing the horn.

---

[2] There is no evidence in the record indicating where Mosher entered the tracks. There were "No Trespassing" signs posted between mile markers 633 and 632 - the area where the accident occurred. The record shows, however, that both Mosher and his mother were aware that the railroad tracks were an active rail line. Mosher and his family moved to their home on Main Street (Route 11) in New Milford at the end of August 2012, and had been living there for about three-and-a-half months prior to the accident. Route 11 runs parallel with the railroad tracks which are located approximately 500 feet behind Plaintiff's house.

According to the Railview video from the second locomotive in the train, Boyd began blowing the horn at 08:09:23 on the video, and continued blowing it for approximately sixteen (16) seconds until 08:09:39. Boyd initially testified that he was approximately eight (8) seconds into blowing the horn when he realized that "the blob" was a person. Later, Boyd testified that he did not know exactly at what point he recognized "the blob" as being a pedestrian, but, during the time the person came into focus, Boyd never stopped sounding the horn.

Boyd did not engage the emergency brakes at that time because, as he testified, he thought the person was going to get out of the way. Even when Boyd was 7 to 9 seconds into blowing the horn, Boyd testified that he still thought the pedestrian was going to vacate the tracks. At 8:09:39 on the Railview video, after continuously blowing the horn for approximately 16 seconds, Boyd stopped blowing the horn to engage the emergency brakes. It was apparently at that point when Boyd realized that the person was not going to step out of the train's path.

In the early part of his deposition, Boyd was asked to describe the accident and testified as follows:

> Early in the morning going north going into Binghamton coming around a -- two sets of corners [curves] and seeing something on -- you know, near the tracks, not sure exactly where it was at at the point as far as where we're at; come around the corner and blew the horn and, as we got closer, it turned out to be an individual instead of an animal or an object or a tree or a bush or whatever it may have been at the time that we first seen the object. At that point, I stayed on the horn; and when I seen that he was not going to move and immediate danger, I put the train in emergency.

Boyd stopped blowing the horn at 8:09:39 because he needed to use his left hand, which was operating the horn, to place the train into emergency. He then went back to blowing the horn with his right hand. It is undisputed that after the horn stopped blowing at 8:09:39 on the Railview video, the horn started to blow again at 8:09:42, and emergency brakes were engaged at 8:09:43. Boyd believes that the train's emergency brakes were engaged just before the pedestrian was struck.

NSRC Road Foreman Philip Koerner ("Koerner") was present after the accident. He was unable to download the event recorder data from the lead locomotive, NS 6713, but was able to download the event recorder data from the second locomotive, NS 9138. Based on the data, it is undisputed that the train was in emergency mode at 8:04:32 when the automatic brake pipe pressure ("ABK psi") was at 57. It is also undisputed that Boyd made a first service application of the brakes at least 4 seconds prior to the emergency application of the brakes.

When the train's emergency brakes were engaged at 8:04:32, the train was traveling at a speed of 39 miles per hour. Moreover, according to the event recorder data for NS 9138, in the two minutes leading up to the accident, the train's speed did not exceed 40 miles per hour, except for a period of approximately six seconds from 8:04:21 to 8:04:26. During that time, Boyd was already in "dynamic braking" (which is different from emergency braking), and increasing it. Koerner explained that the increase in dynamic braking could cause the "slack of the train to come in" and give "a little boot from behind" that could cause speed to increase, which is confirmed by the Railview video, showing that the speed of the train slightly increased.

After the train struck the pedestrian, who never turned around to see the approaching locomotive, Boyd called dispatch and requested medical personnel, and the dispatcher called 9-1-1. The pedestrian was later identified as Mosher, who sustained fatal injuries due to blunt force trauma to the head.

Pennsylvania State Police Trooper John Oliver ("Oliver") investigated the accident. He noted the presence of ear buds and an iPod at the scene, which, according to Oliver, appeared to be part of Mosher's personal belongings. Oliver concluded that Mosher may have been wearing headphones and listening to music at the time of the accident. There is no evidence in the record, however, that the train crew at any time became aware that Mosher may have been wearing headphones and/or listening to music and might not hear the approaching train.

No criminal charges were brought against the members of the train crew. None of the

crew members were disciplined by NSRC in connection with the accident.

On December 8, 2014, Plaintiff Tammy Marsh filed a wrongful death and survival action Complaint in this Court alleging claims of negligence against Defendants, and sought punitive damages. (Doc. 1). Plaintiff thereafter filed an Amended Complaint on December 17, 2014. (Doc. 6).

The Amended Complaint contains the following claims: (1) Count I alleging that the death of Mosher was the direct and proximate result of the negligence, carelessness and recklessness of NSRC, by and through its employees, agents, servants and/or workmen, in the following respects:

<dl>
<dt>(a)</dt>
<dd>Norfolk Southern breached its duty of care and was negligent, grossly negligent and reckless in causing Plaintiff's Decedent's death in that the train was traveling at a speed greater than that which was reasonable and prudent under the circumstances;</dd>
<dt>(b)</dt>
<dd>Norfolk Southern breached its duty of care and was negligent, careless and reckless in causing Plaintiff's Decedent's death in that its train was traveling at a speed greater than that permitted under the applicable laws and regulations, in particular the Federal Railroad Safety Act, 49 U.S.C. § 20106, et seq., and such excessive speed caused Plaintiff's Decedent to be struck by the train;</dd>
<dt>(c)</dt>
<dd>Norfolk Southern breached its duty to ensure its trains were operated in conformity with federal regulations, pursuant to the Federal Railroad Safety Act, 49 U.S.C. § 20106, et seq., and in a safe manner;</dd>
<dt>(d)</dt>
<dd>Norfolk Southern breached its duty of care and was negligent, careless and reckless in that it knew or should have known of the potential for pedestrians walking alongside and/or on the tracks, but failed to require its employees to operate its train at a reasonable and prudent speed, and to require its employees to adequately slow or stop the train so pedestrians, including Plaintiff's Decedent, could avoid injury and/or death;</dd>
<dt>(e)</dt>
<dd>Norfolk Southern failed to properly warn the Plaintiff's Decedent that a train was approaching on the tracks on which he was killed when Norfolk Southern's train struck and killed him;</dd>
<dt>(f)</dt>
<dd>Norfolk Southern negligently maintained the train, engine and snow plow involved in this incident, in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20106, et seq.;</dd>
<dt>(g)</dt>
<dd>Norfolk Southern operated its train through its employees, agents and/or workmen, and is therefore vicariously liable for the negligent, careless and reckless actions of its employees, including Defendant, Jeffrey D. Boyd, in failing to safely operate the train;</dd>
<dt>(h)</dt>
<dd>Norfolk Southern acted negligently, carelessly and recklessly in failing to properly train, supervise and/or instruct the train</dd>
</dl>

crew, including the engineer, on stopping or slowing a train when the train crew is confronted with a pedestrian adjacent to and/or on the train tracks upon which the train is proceeding;

(i)     Norfolk Southern acted negligently, carelessly and recklessly when its employees, at the first sight of Plaintiff's Decedent on the train tracks, failed to take reasonable steps to avoid striking and fatally injuring the Plaintiff's Decedent;

(j)     Norfolk Southern acted negligently, carelessly and recklessly when it operated its train in excess of the maximum allowable operating speed for freight trains on the Class track located in New Milford, in violation of 49 C.F.R. § 213.9;

(k)     Norfolk Southern acted negligently, carelessly and recklessly when it failed to ensure the train's braking system was compliant with federal regulations pursuant to 49 C.F.R. § 229.47, et seq.;

(l)     Norfolk Southern acted negligently, carelessly and recklessly when it failed to ensure that the train's locomotive horn produced a minimum sound level of 96 dB(a) at 100 feet forward of the locomotive in its direction of travel, pursuant to 49 C.F.R. § 229.129;

(m)     Norfolk Southern knew or should have known of the potential for pedestrians walking alongside and/or upon the tracks, and in this specific instances had actual knowledge of Plaintiff's Decedent's presence on the tracks prior to his fatal injuries;

(n)     Norfolk Southern's actual and constructive knowledge of the Plaintiff's Decedent's presence alongside and/or upon the tracks before the train collided with his person came at a sufficient time before the collision to allow Norfolk Southern to reasonably avoid or prevent the fatal collision; and,

(o)     Norfolk Southern substantially contributed to cause and proximately caused the fatal injuries to Plaintiff's Decedent by operating, through its agents and employees, the train in a negligent, careless and reckless manner in violation of Norfolk Southern's internal rules governing the operation of trains, and in violation of various federal regulations.

(Doc. 6, at 8-10); Count (2) alleging that Boyd, operated the train negligently, carelessly and recklessly in violation of federal and state regulations, thereby causing the fatal injuries Mosher, by, *inter alia*, failing to apply brakes and take other preventive action to slow down the train at the first sight of Mosher alongside and/or on the railroad tracks, and failing to apply brakes and take other preventive action to slow down the train, which substantially contributed to cause and proximately caused Mosher's fatal injuries; Count (3) alleging that the death of Mosher was the direct and proximate result of the negligence, carelessness and recklessness of CPR in that, as the owner of the tracks, CPR, *inter alia*, failed to warn pedestrians and minors that the area was a private property and that it was unsafe for walking upon, and failed to police or post the tracks and surrounding property; Count (4)

bringing an action for wrongful death pursuant to 42 Pa. C.S.A. § 8301; and Count (5) bringing a survival action under Pennsylvania common law.

On May 26, 2016, Defendants filed the instant Motion for Summary Judgment (Doc. 47). Oral argument on the motion was heard on November 30, 2016. The motion has been fully briefed and is now ripe for disposition.

## II. Legal Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Carrasca v. Pomeroy*, 313 F.3d 828, 832-33 (3d Cir. 2002). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although entitled to the benefit of all justifiable inferences from the evidence, *id*. at 255, the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth "specific facts showing that there is a genuine issue for trial," else summary judgment, "if appropriate," will be entered. Fed. R. Civ. P. 56(e). This is so because, "[i]n considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

As such, a moving party is obligated to meet "the burden of supporting [its] motion[] 'with credible evidence . . . that would entitle [that party] to a directed verdict if not controverted at trial.'" *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex*, 477 U.S. at 331); *see also United States v. Four Parcels of Real Prop*., 941 F.2d 1428, 1438 (11th Cir. 1991) ("[T]he moving party . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.") (emphasis removed, internal citations omitted). Once the moving party

7

has satisfied its burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Twp*., 772 F.2d 1103, 1109 (3d Cir. 1985). Hence, the party opposing the motion for summary judgment cannot rest merely on its allegations and must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc*., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

### III. Analysis

A.   **Claims Against Defendants Norfolk Southern Railway Company and Locomotive Engineer Jeffrey D. Boyd**

Defendants NSRC and Body are entitled to summary judgment because Plaintiff has failed to present a genuine issue of material fact that either Boyd or NSRC breached their duty to refrain from wanton misconduct. Moreover, many of Plaintiff's claims are preempted by federal law and, thus, fail as a matter of law.

1.    **Wanton Misconduct**

Both parties agree that Mosher was a trespasser (Doc. 49, at 6; Doc. 54, at ¶1), and that under Pennsylvania law, the duty owed to trespassers is limited to preventing the wanton or willful infliction of injury. 42 Pa. C.S.A. § 8339.1. (Doc. 49, at 6; Doc. 55, at 12). Plaintiff concedes that Defendants' conduct was not willful; she argues, however, that it was wanton. (Doc. 55, at 12).

The burden is on the trespasser to prove willfulness or wantonness. *Ott v. Unclaimed Freight Co.*, 577 A.2d 894, 897 (Pa. Super. 1990). In *Evans v. Philadelphia Transp. Co.*, 418 Pa. 567, 574, 212 A.2d 440, 443 (1965), the Pennsylvania Supreme Court clarified the difference between willful and wanton misconduct:

willful misconduct means that the actor desired to bring about the result that

8

> followed, or at least that he was aware that it was substantially certain to
> ensue. This, of course, would necessarily entail actual prior knowledge of the
> trespasser's peril. Wanton misconduct, on the other hand, means that the
> actor has intentionally done an act of an unreasonable character, in
> disregard of a risk known to him or so obvious that he must be taken to have
> been aware of it, and so great as to make it highly probable that harm would
> follow.

*Id.* at 443. The Pennsylvania Supreme Court further clarified that:

> [w]anton misconduct is ordinarily accompanied by a conscious indifference
> to the consequences and only exists where the danger to plaintiff is realized
> and is so recklessly disregarded that there is at least a willingness to inflict
> injury, if not the actual intent to do same.

*Dudley v. USX Corp.*, 414 Pa. Super. 160, 172, 606 A.2d 916, 922 (1992). [3]

The difference between negligence and willful or wanton misconduct is also instructive. As the Pennsylvania Supreme Court explained:

> wanton misconduct is something different from negligence, however
> gross—different not merely in degree but in kind, and evincing a different
> state of mind on the part of the tortfeasor. Negligence consists of inattention
> or inadvertence, whereas wantonness exists where the danger to the
> plaintiff, though realized, is so recklessly disregarded that, even though there
> be no actual intent, there is at least a willingness to inflict injury. . . .

*Kasanovich v. George*, 348 Pa. 199, 203, 34 A.2d 523, 525 (1943). *See also Krivijanski v. Union Railroad Co.*, 357 Pa. Super. 196, 515 A.2d 933 (1986).

Here, Plaintiff argues that the question of wantonness should be submitted to the jury. She points to the deposition testimony from Willis, the conductor trainee who witnessed the accident, who notified the train engineer, Boyd, that there was "foot traffic" up ahead and that Boyd acknowledged this. (Doc. 55, at 16). Therefore, Plaintiff argues, Boyd had knowledge of the presence of Mosher. *Id.* According to Plaintiff, as soon as Boyd was notified that there was a pedestrian on the tracks, Boyd should have taken action to avoid striking him. *Id.* at 14. Therefore, for Plaintiff, the core issue in this case is the timing of the train operator's

---

[3] At least one district court distinguished willfulness from wantonness by stating that "willful misconduct is something akin to intentional conduct," whereas "wanton misconduct is more akin to recklessness." *Manfred v. Amtrak*, 106 F. Supp.3d 678, 683 (W.D. Pa. 2015). That distinction, however, is incorrect, because the Pennsylvania Supreme Court has explicitly held that it is improper to equate "willful misconduct" with intentional conduct. *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289 (Pa.1994).

realization that there was a person on the tracks, and whether Boyd could have, or should have, taken action to avoid the accident, given that Mosher was not responding to the horn and never turned around. According to Plaintiff, "a reasonable jury could conclude that [Boyd] had sufficient time in which he recognized [Mosher] on the tracks, and he could have taken action to slow the train and provide better warning to [Mosher]." *Id.* at 18. In other words, Plaintiff claims that Boyd should have realized at an earlier point that Mosher was in a position of peril, and, at that time, should have invoked measures to avoid the accident. After a careful review of the record in this case, I disagree.

As soon as the crew saw and acknowledged that something was ahead of the train, Boyd began to blow the horn. (Doc. 48, at ¶¶ 8-12). The horn was blown for approximately 16 seconds. *Id.* at ¶ 13. At some point during the 16 seconds, the crew realized that there was a pedestrian walking along the tie butts (outside the rails), and Boyd never stopped sounding the horn in order to provide a warning, with the assumption that the pedestrian was going to vacate the tracks. *Id.* at ¶¶ 14-15. Boyd did not apply the emergency brakes during this time because, as he testified at his deposition, he thought that Mosher was going to get out of the way, consistent with Boyd's prior experience. *Id.* at ¶ 15.

Boyd did not manifest a reckless disregard of the existing or potential danger because it was reasonable for him to believe that Mosher would vacate the tracks after receiving sufficient warning from the approaching train. *See Moss v. Reading Co.,* 418 Pa. 598, 602, 212 A.2d 226, 228–29 (1965) (holding that a train operator was not guilty of wanton misconduct in failing to apply emergency brakes in time to avoid striking decedent, since the operator had a right to believe that decedent would vacate the tracks, even though decedent made no apparent reaction to warning whistles). "Although the engineman testified that decedent made no apparent reaction to his warning whistles, that fact is not sufficient to have given the engineman reason to believe that the warnings would have no effect on decedent's conduct and that decedent would place himself in a position of peril." *Moss v. Reading Co.*, 418 Pa. 598, 602, 212 A.2d 226, 228–29 (1965). *See also Kowaleski v. Pennsylvania R. Co.*, 103 F.2d 827, 830 (3d Cir. 1939).

"The mere fact that this action was too late to avoid the accident can in no way detract from the fact that the engineman took reasonable care to avoid the accident the minute he realized that decedent was in a position of peril." *Moss v. Reading Co.*, 418 Pa. 598, 603, 212 A.2d 226, 229 (1965). Moreover, according to Plaintiff's expert, even if Boyd had applied the emergency brakes when he first began to blow the horn, the train would not have stopped in time to prevent the accident and Mosher would still have been struck in the head by a 2,571-ton train at a speed of seven to ten miles per hour. *Id.* at ¶ 32. There was, of course, no obligation to apply the emergency brakes upon the first sight of Mosher because, first, the crew did not know at that time that a person, as opposed to an object, was present on the tracks, and second, there was no reason for the crew to suspect that Mosher was in a position of peril once they did identify the "blob" as a person, because of the reasonable and permitted by law assumption that a pedestrian will vacate the tracks. Thus, Plaintiff's argument that "Boyd acted . . . recklessly in failing to apply brakes . . . at the first sight of [Mosher]," (Doc. 1, at 9), fails as a matter of law. *See Moss v. Reading Company*, 212 A.2d 226 (Pa. 1965), *Kowaleski v. Pennsylvania R. Co.*, 103 F.2d 827 (3d Cir. 1939); *Alvin J. Barr, Inc. v. Consol. Rail Corp.*, 1999 WL 554598, at *4 (E.D. Pa. June 23, 1999) ("Pennsylvania courts have determined that it is reasonable to expect trespassers to vacate the tracks after receiving sufficient warning from approaching trains.") (citations omitted); *Manfred v. Nat'l R.R. Passenger Corp.*, 106 F. Supp. 3d 678, 687 (W.D. Pa. 2015) ("[Train's engineer] simply did not have a duty to apply braking of any kind until after he determined that [the pedestrian] was not vacating the tracks based on the sounding of the train's horn.").

Moreover, to the extent that Plaintiff argues that Boyd should have *sooner* realized that the "blob" on the tracks was a pedestrian,[4] such an allegation does not point to wanton misconduct. At most, it is evidence of inattention or inadvertence, which, as the Pennsylvania Supreme Court has repeatedly held, amounts to nothing more than negligence. *See*

---

[4] Plaintiff's expert Ellie Francis, Ph.D., who is a Visual Human Factors expert, expressed an opinion as to the reasonable times at which a pedestrian should have been identified. (Doc. 55-24, at 3-13).

*Kasanovich v. George*, 348 Pa. 199, 203, 34 A.2d 523, 525 (1943). After all, it is "not wanton negligence to fail to use care to discover the presence of an unanticipated trespasser." *Frederick v. Philadelphia Rapid Transit Co.*, 337 Pa. 136, 140, 10 A.2d 576, 578 (1940). [5]

To the extent, however, that Plaintiff argues that Boyd should have sooner applied the emergency brakes, I note first that it is not clear that Boyd was duty-bound to apply the emergency brakes at all. In the Third Circuit's *Kowaleski v. Pennsylvania R. Co.*, 103 F.2d 827, 830 (3d Cir. 1939), the train operator never endeavored to slow down or stop the train and, instead, merely sounded a warning signal, which proved to be insufficient to prevent a tragic accident. The court held that in light of the presumption that after the sounding of a warning signal a pedestrian will leave the tracks in time to escape any injury, the engineer's conduct could not be described as either wilful or wanton. *See also Moss v. Reading Co.*, 418 Pa. 598, 602, 212 A.2d 226, 228 (1965).

Nevertheless, between the endpoints of applying the brakes at the very first sight of Mosher, which, as already explained, is not mandated by caselaw, and not applying the brakes at all, there exists a gray area of hypothetical scenarios encompassing Boyd's reaction time, and it is in that area where Boyd's wantonness apparently lies. I disagree. Mosher would have been struck by the 2,571-ton train no matter what, as Plaintiff's expert reports: if the brakes were applied immediately, the speed of the train would have been seven to ten miles per hour; if the brakes were applied "10 seconds earlier, [the train] would come to a stop 10 seconds earlier"; "if the train was placed into emergency at a different

---

[5] The instant case is similar to that in *Gresart ex rel. Gresart v. Buffalo & Pittsburgh R.R.*, 2016 WL 797059 (Pa. Super. Ct. Mar. 1, 2016), where the Superior Court of Pennsylvania found that "[Plaintiff's expert's] personal observation of the accident scene demonstrates only that a conductor could have possibly seen a person on the tracks 600 feet ahead. However, [Plaintiff] was required to demonstrate that [the engineer] did, in fact, see [the decedent] in enough time to stop the train, and failed to do so, either purposefully (willful misconduct) or with reckless disregard to the danger of failing to take action (wanton misconduct). [The expert's] personal observation proves only that [the engineer] may have been inattentive, and, thus, negligent, but does not demonstrate [the engineer] saw [the decedent] with sufficient time to avoid the accident." *Id.* at *7.

point in time," "many hypothetical scenarios . . . can be analyzed to determine how the dynamics would be altered." (Doc. 48-10, at 9).

Following Plaintiff's logic, at some point during the mere sixteen seconds, Boyd's conduct changed from reasonable, to negligent, to, apparently, wanton. Plaintiff would like to imbue the concept of wantonness with the sort of rigidity that is capable of manufacturing arbitrary segmentation of time in that liability somehow attached upon the passing of the second, or fourth, or seventh second following the identification of the "blob" on the tracks as a person. However, it is precisely the granularity of the data and the minute distinctions in time and conduct, where Plaintiff seeks to capture wantonness, that I find wantonness to be elusive.

There is nothing in the record that points to Boyd's "willingness to inflict injury." *Kasanovich v. George*, 348 Pa. 199, 203, 34 A.2d 523, 525 (1943). Nothing in the record is capable of ascertaining that Boyd exhibited "conscious indifference to the perpetration of the wrong" during the sixteen fateful seconds, or was "reckless" in his disregard of the danger. *Id.; Dudley v. USX Corp*., 414 Pa. Super. 160, 172, 606 A.2d 916, 922 (1992).

Plaintiff, however, points to *Frederick v. Philadelphia Rapid Transit Co.*, 337 Pa. 136, 141, 10 A.2d 576, 578–79 (1940) for support. In *Frederick*, the plaintiff was a passenger in the first car of a train operated by the defendant. When he disembarked the train and walked along the platform, he slipped and fell into the pathway of the train. The train stopped when a mechanical device detected the presence of something underneath the train. A witness also notified the conductor that a person was under the train, although the conductor later denied that. Subsequently, the conductor and a motorman performed a cursory search underneath the train wherein they failed to detect the plaintiff. Following the search, the train proceeded and passed over the plaintiff's body resulting in serious injuries. A jury awarded for the plaintiff, after which the defendant's motion for judgment notwithstanding the verdict was granted. Upon the plaintiff's appeal to the Supreme Court, the judgment notwithstanding the verdict was reversed.

The core issue in *Frederick* revolved around the questions of notice and credibility.

13

"The motorman knew that the train had proceeded three-quarters of a car length after the emergency brake first went on, from which it could have been readily inferred that the object, whatever it was, which had come in contact with the tripper, was probably to be found in the vicinity of the rear trucks of the front car." *Id.* at 141. Moreover, "[i]f [the witness'] testimony was believed by the jury[,] it meant that a person who could have had no self-interest or improper motive and was therefore presumably credible told the conductor, 'There is a man down under there.'" *Id.* at 141. Thus, according to the Pennsylvania Supreme Court, "[t]he emergency stop and the information given by [the witness] cumulatively constituted, as the jury evidently found, impressive warning as to the situation." *Id.* Therefore, in *Frederick*, unlike the instant case, there were genuine issues of credibility for the jury to resolve. Moreover, the pedestrian in *Frederick* was in a position of peril from the very moment the engineer was notified of the pedestrian's presence underneath the train by the very mechanism intended to detect the presence of a person or an object in the train's path.

The second case Plaintiff relies on, *Evans v. Philadelphia Transp. Co.*, 418 Pa. 567, 212 A.2d 440 (1965), is equally inapposite. In *Evans*, the decedent fell on the subway tracks. "At the time of the accident, decedent was lying in the space between the rails of the westbound track with 'one leg and part of a foot' on one rail. While lying in that position, decedent was struck by a [Philadelphia Transportation Company] westbound train and sustained very serious personal injuries." *Id.* at 570. The Pennsylvania Supreme Court reviewed the trial court's denial of the defendant's motion for judgment notwithstanding the verdict, which raised the issue of whether the evidence presented could warrant a finding of wanton misconduct.

The court ruled that the motion for judgment n.o.v. was properly overruled because "it was for the jury to say whether or not wanton misconduct was present." *Id.* at 573. The court said that,

> the evidence is clear that the operator saw an unusual object lying in the tracks in the path of the train at a time when it was sufficiently far away to stop and avoid the accident. On the basis thereof, the jury would be warranted in finding that a reasonable man, operating this train, would have

> been more diligent in trying to ascertain the particular nature of the object which he knew to be within the range of his unchangeable path, and the failure to do so, especially in view of the contiguity of the passenger platform, was a reckless disregard for the safety of anyone who might be there.

*Id*. at 573

The instant case, however, does not involve an unconscious person lying on the subway tracks next to a passenger platform. It does not involve a situation where the train was ever sufficiently far away, upon the observance of the "blob" on the tracks by the motorman, to stop and avoid the accident. Rather, the instant case revolves around a trespasser who was expected to vacate the tracks after receiving sufficient warning from the approaching train.

Thus, Plaintiff has failed to present a genuine issue of material fact that either Boyd or NSRC breached their duty to refrain from wanton misconduct.

### 2. Federal Preemption

Congress enacted the Federal Railroad Safety Act ("FRSA") in 1970 "to promote safety in every area of railroad operations and reduce railroad related accidents and incidents." 49 U.S.C. § 20101. The Act grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety." *Id*. § 20103(a); *see also Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000). The FRSA also contains an express preemption clause, which provides: "Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1).

However, in 2007, Congress amended the Act in response to a number of cases, including the Eighth Circuit's decision in *Lundeen v. Canadian Pac. Ry. Co.*, 447 F.3d 606, 611 (8th Cir. 2006), vacated, 532 F.3d 682 (8th Cir. 2008), which converted the preemption clause into a vehicle to preclude state damages claims that arose from catastrophic railroad accidents. The "Clarification Amendment" of § 20106 retained the same text of the prior version of that section, but labeled the original language "subpart (a)" and changed the title of § 20106 from "National Uniformity of Regulation" to "Preemption." Congress also added

15

the following provisions:

> (b) Clarification regarding State law causes of action.
>> (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party --
>>> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;
>>> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>>> (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a) (2).
>> (2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

42 U.S.C. § 20106(b).

Shortly after the amendment to § 20106 was enacted, some commentators and members of the plaintiffs' bar proclaimed that federal preemption under the FRSA no longer existed or had been significantly eroded. *See* J.D. Lee & David C. Lee, *Federal Preemption of State Law Governing Railroad Crossings: 2007 Statutory Amendments*, 6 LITIGATING TORT CASES § 70:3.5 (2008) ("Thus, plaintiffs in such actions now get their day in court, where they will win or lose on the claim's merits."); Sharon L. Van Dyck, *A Clear Path for Railroad Negligence Cases*, 44 TRIAL 50, 51 (2008) ("This change significantly shortens preemption's reach."). Some even argued that caselaw decided under the previous statute was no longer applicable in preemption cases. *Id.* ("The amendment addresses [preemption's] reach by articulating a new preemption standard, so the case law developed under the old standard no longer determines the scope of § 20106 preemption."). Plaintiff in the instant case also contends that § 20106(b) "expressly disclaims any preemptive effect of claims for failure to comply with federal standards." (Doc. 55, at 37-38).

Courts, however, have taken a different view. In fact, every court that has considered this issue has reaffirmed the vitality of preemption under the FRSA and held that the 2007 amendment did not overrule any prior precedent.

The Tenth Circuit, in *Henning v. Union Pacific Railroad*, was the first federal appellate court to rule on the issue. 530 F.3d 1206, 1215 (10th Cir. 2008). The Tenth Circuit rejected the plaintiff's argument that her claim of inadequate signalization of a railroad crossing was permitted under the Clarification Amendment to § 20106. In reaching this conclusion, the Tenth Circuit observed that, in amending § 20106, "Congress did not overrule any precedent, but instead provided clarification for courts interpreting precedent, establishing [that] FRSA preemption does not apply when a railroad violates a federal safety standard of care," and concluded that "[h]ad Congress sought to overrule [any Supreme Court precedent], it would have done so in express terms." *Henning*, 530 F.3d at 1216. The court also noted that because subsection (b) was labeled a "clarification," it indicated that Congress sought to resolve an ambiguity in the law's application "rather than to effect a substantive change." *Id*.

Subsequently, other courts to consider this issue have reached the same conclusion. *Grade v. BNSF Ry. Co.*, 676 F.3d 680, 65-86 (8th Cir. 2012); *S. California Reg'l Rail Auth. v. Superior Court*, 163 Cal. App. 4th 712, 735, 77 Cal. Rptr. 3d 765, 782 (2008); *Smith v. Burlington N. Santa Fe Ry. Co.*, 187 P.3d 639 (Mont. 2008). Therefore, while the FRSA expressly provides for preemption of state law claims, a plaintiff may avoid federal preemption by alleging a railroad's failure to comply with federal regulations. Stated differently, preemption continues to be a viable defense when a defendant demonstrates that it complied with the applicable federal standards set forth in the FRSA regulations.

Here, Defendants argue that preemption applies to Plaintiff's claims: (1) for failure to properly train, supervise, and instruct; (2) that the locomotive horn should have been louder; (3) that the horn pattern was inadequate and should have been of longer duration; and (4) alleging excessive speed of the train. Defendants argue that they complied with the applicable federal standards, but that even if Plaintiff could prove that Defendants did not comply with federal law, such violations would still not rise to the level of wanton misconduct.

**a.      Plaintiff's claims alleging failure to properly train, supervise and instruct**

In paragraph 23(h) of the Amended Complaint, Plaintiff alleges that NSRC failed "to

properly train, supervise and/or instruct the train crew on stopping or slowing a train when the train crew is confronted with a pedestrian adjacent to and/or on the train tracks upon which the train is proceeding." (Doc. 6).

Plaintiff, however, is unable to show, as she must, that any certifications, training, policies, procedures, and practices for NSRC's engineers violated any of the federal standards contained in 49 C.F.R. § 240. The Secretary of Transportation has promulgated Section 240 of the Code of Federal Regulations "to ensure that only qualified persons operate a locomotive or train." *Id.* § 240.1(a). Section 240 specifies standards for the "eligibility, training, testing, certification and monitoring of all locomotive engineers." *Id.* § 240.1(b). The regulations include a detailed scheme by which a railroad company must obtain Federal Railroad Administration ("FRA") approval of its engineer and conductor certification programs, including its criteria for continuing education, testing, training, and monitoring of performance. *See* §§ 240 & 242. Moreover, pursuant to Section 217, railroads must periodically conduct operational tests and inspections to determine the extent of employees' compliance with its operating rules, timetables, and other special instructions. *Id.* § 217.9.

As the Supreme Court has explained, "[t]o prevail on the claim that [federal] regulations have pre-emptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, . . . pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood*, 507 U.S. at 664, 113 S.Ct. 1732. Relying on *Easterwood*, and citing Sections 217 and 240, the Ninth Circuit has held that "[i]It is clear that the federal training regulations do 'substantially subsume' the subject of employee training." *Union Pac. R. Co. v. California Pub. Utilities Comm'n*, 346 F.3d 851, 868 (9th Cir. 2003). Other courts have come to the same conclusion. *Dowe v. Nat'l R.R. Passenger Corp.*, 2004 WL 887410, at *5 (N.D.Ill. Apr.26, 2004) (finding that "federal law preempts state law regarding training of locomotive engineers"); *Lombardy v. Norfolk S. Ry. Co.*, 2014 WL 2468612, at *8 (N.D. Ind. June 3, 2014) ("Plaintiff's claims for negligent training, education, instruction, supervision, and qualification are precluded by

the FRSA. . . . [T]he Secretary of Transportation issued comprehensive regulations covering the subjects of training, instruction, education, qualification, and supervision of railroad employees (Parts 217 and 240) and it is undisputed that Norfolk complied with the federal operating and training rules."); *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 804-05 (7th Cir. 1999) (holding that Wisconsin's additional regulations providing "qualification requirements for locomotive engineers . . . and for trainmen . . . are preempted"); *Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1155 (N.D. Cal. 2014); *see also Thompson v. Northeast Ill. Reg'l Commuter R.R.*, 854 N.E.2d 744, 747 (Ill. App. Ct. 2006). Plaintiff has not made an argument to the contrary.

Moreover, although Plaintiff argues that Boyd and NSRC have breached federal regulations on railroad employee training, she does not articulate which regulations were violated and how NSRC's policies do not comply with them. Rather, Plaintiff merely contends that "it is obvious that [NSRC's] subordinates were not trained and monitored properly in the areas of operational safety." (Doc. 55, at 39). However, Plaintiff must do more than make conclusory allegations to meet her burden in opposing summary judgment—she must come forward with evidence in support of her claim for failure to train. *See Celotex Corp*, 477 U.S. at 323. She has not done so.

In fact, there is no dispute that Boyd was a certified locomotive engineer and that Chesmore was a certified conductor under NSRC's FRA-approved certification programs in accordance with the FRA regulations set forth in §§ 217, 240 and 242. (Doc. 48, at ¶ 60). Thus, Plaintiff's claims for failure to properly train, supervise, or instruct are preempted by federal law.

### b.     Plaintiff's claims alleging that the horn should have been louder

In Paragraph 23(l) of the Amended Complaint, Plaintiff alleges that NSRC failed to ensure that "the train's locomotive horn produced a minimum sound level of 96 db(a) at 100 feet forward of the locomotive in its direction of travel. . . . " (Doc. 6).

Pursuant to 49 C.F.R. § 229.129, the Secretary of Transportation has issued regulations that cover the subject matter of the volume level of locomotive horns, detailing

the precise minimum and maximum decibel levels at which a horn should sound, as measured 100 feet forward of the locomotive, and specifying how to test for compliance.

Plaintiff, however, has not presented any evidence that the volume of the train horn failed to comply with § 229.129. To the contrary, as set forth in the declaration of Sean Ogureck, a Senior General Foreman for NSRC, the locomotive at issue fully complied with federal regulations. (Doc. 48, at ¶ 59). A horn sound test was completed on August 27, 2012, which demonstrated that the decibel level of the locomotive met the requirements of § 229.129(a).

Thus, because Plaintiff cannot point to any violations of the applicable federal regulations governing warning devices, her wanton claim is preempted. *See Marshall v. Burlington N., Inc*., 720 F.2d 1149, 1153 (9th Cir. 1983) ("[The railroad] therefore, complied as a matter of law with its duty to provide locomotive warning devices when it met the requirements of [§§ 229.125, 229.129]."); *Kuntz v. Illinois Cent. R. Co.*, 469 F. Supp. 2d 586, 593 (S.D. Ill. 2007) ("[T]o the extent the claim asserted in the complaint that the train failed to sound a proper warning is based on the volume level of the warning, such a claim is preempted under [§ 229.129]."); *see also Eubanks v. Norfolk S. Ry. Co.*, 875 F. Supp. 2d 893, 902 (N.D. Ind. 2012); *Fegler v. Union Pac. R. Co.*, 2006 WL 5492241, at *2 (D. Wyo. July 20, 2006).

### c.    Plaintiff's claims alleging that the horn pattern was inadequate

Plaintiff alleges next that Boyd failed to warn Mosher of the train's approach and failed to comply with NSRC's internal rules. Specifically, Plaintiff's expert Charles Culver opined that Boyd violated General Code of Operating Rules ("GCOR") 5.8.2 by blowing the horn continuously instead of sounding the horn using a "succession of short sounds," as GCOR mandates. (Doc. 6).

The federal requirements for sounding the horn when not at a public crossing are set forth in 49 C.F.R. § 222.23(a), which provides that "a locomotive engineer may sound the locomotive horn to provide a warning to . . . trespassers in an emergency situation if, in the locomotive engineer's sole judgment, such action is appropriate in order to prevent imminent

20

injury, death, or property damage." Plaintiff does not claim, however, that Boyd was not compliant with federal regulations; rather, she alleges a failure to comply with NSRC's internal code.

Therefore, to the extent that Plaintiff argues that her claims are not subject to preemption because the railroad failed to comply with GCOR, the Court need only review whether the internal code was created pursuant to any federal regulation. It is simply not sufficient to allege a violation of the railroad's own rules. *Murrell v. Union Pac. R.R. Co.*, 544 F.Supp.2d 1138, 1149–50 (D.Or. 2008). Plaintiff does not cite to any federal regulation mandating the use of a succession of short sounds. Section 222.23(a) provides merely that a locomotive engineer has *discretion* in choosing to sound the horn in an emergency situation; it "does not preclude the sounding of locomotive horns in emergency situations, nor does it impose a legal duty to sound the locomotive horn in such situations." *Id.* Thus, federal law does not impose a legal duty on the engineer to sound the horn.

As such, Plaintiff's argument that the railroad failed to comply with the internal rules "do[es] not save [Plaintiff] from otherwise preempted claims." *Driesen v. Iowa, Chicago & E. R.R. Corp.*, 777 F. Supp. 2d 1143, 1158 (N.D. Iowa 2011); *see also Michael v. Norfolk S. Ry. Co.*, 74 F.3d 271, 273 (11th Cir.1996) (holding that although violations of the railroad's own speed regulations may be evidence of negligence in state court, such regulations are preempted by federal law"); *St. Louis Sw. Ry. Co. v. Pierce*, 68 F.3d 276, 278 (8th Cir.1995).

Even assuming that Plaintiff's claim survives a preemption defense, and, if, indeed, Boyd violated the internal regulations requiring him to use a staccato horn pattern, Plaintiff still must show that Boyd's failure to use the staccato pattern constituted wanton misconduct. As I have already explained, Plaintiff is unable to present a genuine issue of material fact that either Boyd or his employer, NSRC, were guilty of wanton misconduct.

### d.    Plaintiff's claims alleging excessive speed of the train

In paragraphs 23(a), (b), and (j) of the Amended Complaint, Plaintiff alleges that the train was traveling at an excessive speed, which contributed to the accident. (Doc. 6).

The issue of whether state law, as applied to unsafe operating speeds, is preempted

has long been decided by the Supreme Court. In addressing this claim, the Court concluded that 49 C.F.R. § 213.9(a), which sets the maximum allowable operating speeds for all trains, "covered" a state law claim based on unsafe operating speeds. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 674–75, 113 S. Ct. 1732, 1743 (1993).

Because Plaintiff cannot point to any violations of the federal speed regulations, her claim is preempted.

### B.   Claims Against Canadian Pacific Railway

Defendant CPR is entitled to summary judgment because, under Pennsylvania law, it did not owe a duty of care to warn, police, or prevent Mosher from accessing the railroad tracks, or to take any other precautions against his illegal access to CPR's property. *See Malischewski v. Pennsylvania R. Co.*, 52 A.2d 215 (Pa. 1947); *Leithold v. Philadelphia & Reading Railway. Co.*, 47 Pa. Super. 137, 144 (1911). Specifically, under *Scarborough by Scarborough v. Lewis*, 523 Pa. 30, 38, 565 A.2d 122, 126 (1989), CPR had no duty to fence its tracks, and under *Noonan v. Pennsylvania R.R. Co.*, 128 Pa.Super. 497, 194 A. 212, 215 (1937), and *Dugan v. Penn. R.R. Co.*, 387 Pa. 25, 127 A.2d 343, 348 (Pa.1956), there was similarly no duty to erect warning signs or patrol the tracks. *See also Laurie v. Nat'l Passenger R.R. Corp.*, 105 F. App'x 387, 391 (3d Cir. 2004) ("Under Pennsylvania law, [a railroad] has no duty to erect or maintain fences on its right-of-way . . . . Nor does Pennsylvania law require a railroad to post guards or to police tracks to prevent trespassing.").

As such, CPR cannot be held liable for failing to erect barricades or warning signs as a matter of law, and summary judgment will be granted in its favor.

### C.   Plaintiff's Punitive Damages Claims

Finally, all three Defendants are entitled to summary judgment on Plaintiff's claim for punitive damages because there is no evidence of reckless indifference to the rights of others, outrageous conduct, or willful or wanton misconduct, as required by Pennsylvania law. As Plaintiff concedes, analysis of "wanton conduct goes hand-in-hand with a discussion regarding punitive damages." (Doc. 55, at 33). Indeed, under Pennsylvania law,

> [p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff, that the defendant caused or intended to cause and the wealth of the defendant.

Res. (2d) of Torts § 908(2). Thus, punitive damages may be appropriately awarded when a plaintiff has established that a defendant has acted in a fashion "so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Pittsburgh Outdoor Adv. Co. v. Virginia Manor Apts., Inc.*, 436 Pa. 350, 260 A.2d 801 (1970) (holding that assessment of punitive damages is proper when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct).

However, "[b]ecause punitive damages are only allowable where the defendant has acted with willful, wanton, or reckless conduct, and the Court has held that Defendants did not so act in this case, punitive damages are precluded as a matter of law." *Manfred v. Nat'l R.R. Passenger Corp.*, 106 F. Supp. 3d 678, 689 (W.D. Pa. 2015) (citation omitted).

## IV. Conclusion

Because Plaintiff failed to establish that a genuine issue of material fact exists to support the claim that Defendants acted wantonly, Defendants' motion for summary judgment will be granted.

An appropriate order follows.


March 20, 2017                                    /s/ A. Richard Caputo
Date                                             A. Richard Caputo
                                                 United States District Judge

23